Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| TIVO INC., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 2:09-cv-257-JRG |
| | ) | |
| vs. | ) | |
| | ) | |
| VERIZON COMMUNICATIONS, INC.; | ) | JURY TRIAL DEMANDED |
| VERIZON SERVICES CORP.; VERIZON | ) | |
| CORPORATE RESOURCES GROUP, LLC; | ) | |
| VERIZON CORPORATE SERVICES | ) | |
| GROUP INC.; and VERIZON DATA | ) | |
| SERVICES LLC, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

**<u>PROPOSED JURY INSTRUCTIONS</u>**

## I.     INTRODUCTION

LADIES AND GENTLEMEN OF THE JURY:

You have heard the testimony and evidence in this case.  I will now instruct you on the law that you must apply.  It is your duty to follow the law as I give it to you.  On the other hand, you the jury are the judges of the facts.  Do not consider any statement that I have made in the course of trial or make in these instructions as an indication that I have an opinion about the facts of this case.

After I instruct you on the law, the attorneys will have an opportunity to make their closing arguments.  Statements and arguments of the attorneys are not evidence and are not instructions on the law.  They are intended to assist the jury in understanding the evidence and the parties' contentions.

You will remember that at the very beginning of this trial I gave you some general instructions and definitions.  Rather than repeat them, I ask you to recall them now in deciding the facts and issues that you are to decide.

You are to perform your duty without bias or prejudice to any party.  The law does not permit jurors to be governed by sympathy or prejudice.  The court and the parties expect you will carefully and impartially consider all of the evidence, follow the law as I will give it to you, and reach a just verdict.

You are instructed that all persons are equal before the law.  This case should be considered and decided by you as an action between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life.  A corporation is entitled to the same fair trial at your hands as a private individual.  All persons, including

corporations, partnerships, unincorporated associations, and other organizations stand equal

before the law, and are to be dealt with as equals in the court of justice.

> *TiVo Inc. v. EchoStar Communications Corp.*, No. 2:04-CV (DF) (E.D. Tex.);
> *DataTreasury Corp. v. U.S. Bank, N.A.*, No. 2:06:-CV-72 (DF) (E.D. Tex.).

## II.    CONSIDERING WITNESS TESTIMONY

A verdict form has been prepared for you. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form.  Answer each question on the verdict form from the facts as you find them.  Do not decide who you think should win and then answer the questions accordingly.  Your answers and your verdict must be unanimous.

In determining whether any fact has been proved in this case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.  You may also consider any stipulations received in evidence.

You are the sole judges of the credibility or "believability" of each witness and the weight to be given to the witness's testimony.  An important part of your job will be making judgments about the testimony of the witnesses who testified in this case.  You should decide whether you believe what each person had to say and how important that testimony was.  I suggest that in making that decision you ask yourself a few questions: Did the person impress you as honest?  Did the witness have any particular reason not to tell the truth?  Did the witness have any relationship with either of the parties?  Did the witness seem to have a good memory?  Did the witness have the opportunity and ability to understand the questions clearly and answer them directly?  Did the witness's testimony differ from the testimony of other witnesses?  Those are a few of the considerations that will help you determine the accuracy of what each witness said.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact, or, whether there was evidence that at some other time the witness

- 4 -

said or did something, or failed to say or do something, that was different from the testimony he gave at the trial.

While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience.  In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in the case.

The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the other evidence you believe that single witness.

Certain testimony in this case has been presented to you through depositions.  A deposition is the sworn, recorded answers to questions asked of a witness in advance of the trial.  This deposition testimony is entitled to the same consideration and is to be judged by you as to credibility and weighed and otherwise considered by you insofar as possible in the same manner as if the witness had been present and had testified in court from the witness stand.

Adapted from *TiVo Inc. v. EchoStar Communications Corp.*, No. 2:04-CV (DF) (E.D. Tex.); *DataTreasury Corp. v. U.S. Bank, N.A.*, No. 2:06:-CV-72 (DF) (E.D. Tex.).

## III.    EXPERT WITNESSES

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field – such a person is called an expert witness – is permitted to state an opinion on those technical matters.  However, you are not required to accept the opinion.  As with any other witness, it is up to you to decide whether to rely upon it.  In deciding whether to accept or rely upon the opinion of an expert witness, you may consider any bias of the witness, including any bias you may infer from evidence that the expert witness has been or will be paid for reviewing the case and testifying, or from evidence that he testifies regularly as an expert witness and his income from which testimony represents a significant portion of his income.

*TiVo Inc. v. EchoStar Communications Corp.*, No. 2:04-CV (DF) (E.D. Tex.); *DataTreasury Corp. v. U.S. Bank, N.A.*, No. 2:06:-CV-72 (DF) (E.D. Tex.).

## IV.    HOW TO EXAMINE THE EVIDENCE

There are two types of evidence that you may consider in properly finding the truth as to the facts in this case.  One is direct evidence, such as testimony of an eyewitness.  The other is indirect or circumstantial evidence, which is the proof of chain of circumstances that indicates the existence or nonexistence of certain other facts.  As a general rule, the law makes no distinction between direct and circumstantial evidence.

The attorneys have used slides and other visual aids, sometimes referred to as demonstratives, while presenting or examining witnesses.  Demonstratives are not evidence; they are used for the limited purpose of assisting with case presentation and in an effort to help you follow the evidence presented over the course of the trial.

Any notes that you have taken during the trial are only aids to your memory.  If your memory differs from your notes, you should rely on your memory and not on the notes.  The notes are not evidence.  If you have not taken notes, you should rely on your independent recollection of the evidence and should not be unduly influenced by the notes of the other jurors.  Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

By the Court allowing testimony or other evidence to be introduced over the objection of an attorney, the Court did not indicate any opinion as to the weight or effect of such evidence.  As stated before, you are the sole judges of the credibility of all witnesses and the weight and effect of all evidence.

When the Court sustained an objection to a question addressed to a witness, the jury must disregard the question entirely, and may draw no inference from the wording of it or speculate as to what the witness would have testified, if he or she had been permitted to answer the question.

At times during the trial it was necessary for the Court to talk with the lawyers at the bench out of your hearing, or by calling a recess.  We met because often during a trial things come up that do not involve the jury.  You should not speculate on what was discussed during such times.  Also, you will recall that during the course of this trial I instructed you that certain testimony and certain exhibits were admitted into evidence for a limited purpose.  You may consider such evidence only for the limited purpose for which it was admitted.

*DataTreasury Corp. v. U.S. Bank, N.A.*, No. 2:06:-CV-72 (DF) (E.D. Tex.).

## V.      BURDEN OF PROOF

When a party has the burden of proof on any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

When a party has the burden of proving any claim or defense by clear and convincing evidence, it means you must have an abiding conviction that the truth of the party's factual contentions are highly probable.  Such evidence requires a higher standard of proof than proof by a preponderance of the evidence.

In determining whether any fact has been proved in this case, by either of these standards, you should base your decision on all of the evidence, regardless of which party presented it.

You may have heard of a burden of proof that is used in criminal cases called "beyond a reasonable doubt."  That requirement is the highest burden of proof and is used only in criminal cases.  It does not apply to this case, and you should, therefore, put it out of your mind.

*TiVo Inc. v. EchoStar Communications Corp.*, No. 2:04-CV (DF) (E.D. Tex.); *DataTreasury Corp. v. U.S. Bank, N.A.*, No. 2:06:-CV-72 (DF) (E.D. Tex.).

## VI.    THE PARTIES AND THEIR CONTENTIONS

TiVo seeks damages from Verizon for allegedly infringing claims 31 and 61 of U.S. Patent No. 6,233,389 ("the '389 Patent"), claims 1, 4, 8, 10,  and 13 of U.S. Patent No. 7,529,465 ("the '465 Patent"), and claims 3, 15, and 19of U.S. Patent No. 7,493,015 ("the '015 Patent").  Specifically, TiVo contends that Verizon has made, used, sold, and/or offered for sale Motorola digital video recorders ("DVRs") – the QIP2708, QIP6416, QIP7216, QIP7232--that incorporate TiVo's patented technology.  TiVo also argues that Verizon has actively induced others' infringement of the asserted claims, and has contributed to others' infringement of the asserted claims.  TiVo also contends that Verizon's infringement of the '389 patent has been willful .  TiVo seeks damages in the form of lost profits and a reasonable royalty.

Verizon denies that it has infringed the '389 Patent, the '465 Patent, or the '015 Patent.  Verizon denies that it has actively induced or contributed to the infringement of others.  Verizon also denies that it has infringed the '389 patent willfully.  Furthermore, Verizon contends that TiVo's asserted claims are invalid.

Verizon seeks damages from TiVo for allegedly infringing claims 1, 2, 3, and 4 of U.S. Patent No. 5,410,344 ("the '344 Patent").  Specifically, Verizon claims that TiVo has made, used, sold, and/or offered for sale DVRs that incorporate Verizon's patented technology.  Verizon also argues that TiVo has actively induced others' infringement of the asserted claims, and has contributed to others' infringement of the asserted claims.  Verizon further contends that TiVo has acted in concert with others to cause joint or divided infringement.  Verizon also contends that TiVo's infringement has been willful.  Verizon seeks damages in the form of a reasonable royalty.

TiVo denies that it has infringed the '344 Patent.  TiVo denies that it has actively induced or contributed to the infringement of others.  TiVo also denies that it has caused joint or divided infringement, and denies that it has infringed willfully.  Furthermore, TiVo asserts that Verizon's asserted claims are invalid.

I will now give you instructions and definitions to help you in answering the questions that will be presented to you:

Adapted from Federal Circuit Bar Association, *Model Patent Jury Instructions*, § B.1 (2012); adapted from *TiVo Inc. v. EchoStar Communications Corp.*, No. 2:04-CV (DF) (E.D. Tex.); adapted from *Paice LLC v. Toyota Motor Corp.*, No. 2:04-CV-211 (DF) (E.D. Tex.).

## VII.   CLAIM INTERPRETATION

To decide the questions of infringement, you must first understand what the claims of the patent cover, that is, what they prevent anyone else from doing.  This is called "claim interpretation."

The patent claims are the numbered sentences at the end of each patent.  The claims are important because it is the words of the claims that define what a patent covers.  The figures and text in the rest of the patent provide a description and/or examples of the invention and provide a context for the claims, but it is the claims that define how broad or narrow the patent's coverage is.  Each claim is effectively treated as if it were a separate patent, and each claim may cover more or less than another claim.  Therefore what a patent covers depends, in turn, on what each of its claims cover.

It is my duty under the law to interpret what the words used in the patent claims mean.  I have made my determination and I will instruct you accordingly.  You must apply the meaning I give the patent claims to your decisions on infringement and validity.  I will now instruct you how those words are to be construed and understood when deciding the issues of infringement and validity.

**For the '389 Patent**

- The term **"object"** means

   **TiVo's Proposal**: a collection of data and operations

   **Verizon's Proposal**[1]:  a collection of data and operations, wherein "data" means "a set of variable values or state information that reflects the state of progress of the operations," "operations" means "operations that manipulate the set of values or state information," and "collection" means "a set of functionally interrelated data and operations as defined by the programmer."

- The term **"source object"** means

---

[1] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.

**TiVo's Proposal**: a collection of data and operations that (1) extracts video and audio data from a physical data source, (2) obtains a buffer from a transform object, (3) converts video data into data streams, and (4) fills the buffer with the streams.

**Verizon's Proposal**[2]: object that (1) extracts video and audio data from a physical data source, (2) obtains a buffer from a transform object, (3) converts video data into data streams, and (4) fills the buffer with the streams

- The term **"sink object"**

  **TiVo's Proposal**:  a collection of data and operations that (1) obtains data stream buffers from a transform object and (2) outputs the streams to a video and audio decoder"

  **Verizon's Proposal**[3]: object that (1) obtains data stream buffers from a transform object and (2) outputs the streams to a video and audio decoder

- The term "**control object"** means

  **TiVo's Proposal**: a collection of data and operations that receives commands [from] a user that control the flow of broadcast data

  **Verizon's Proposal**[4]: object that receives commands from a user that control the flow of broadcast data

- The term **"buffer"** means "memory where data can be temporarily stored for

  transfer"

- The term **"transform object"** means

  **TiVo's Proposal**: a collection of data and operations that transforms the form of data upon which it operates

  **Verizon's Proposal**[5]: a single, centralized object that transforms the form of data upon which it operates, and that controls the source and sink objects by allocating buffers between them to intelligently manage the asymmetric data-movement demands of the input side and the output side

- The term **"automatically flow controlled"** means

---

[2] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.
[3] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.
[4] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.
[5] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.

**TiVo's Proposal**:  self-regulated[6]

**Verizon's Proposal**[7]: [See Verizon's Proposal for transform object]]

- The term "**wherein said source object extracts video and audio data from said physical data source**" means

   **TiVo's Proposal:** wherein the source object obtains video and audio data from said physical data source

   **Verizon's Proposal**[8]: the source object takes video and audio data out of the physical data source

- The term "**control the flow of the broadcast data through the system**" means

   **TiVo's Proposal**: control the flow of the broadcast data within the system

   **Verizon's Proposal**[9]: control the transmission of the broadcast data from the physical data source to the display

- The term "**wherein said control object sends flow command events to said source, transform, and sink objects**" means

   **TiVo's Proposal**: the control object sends information relating to a change of condition in the flow of the broadcast data to the source, transform, and sink objects

   **Verizon's Proposal**[10]: the control object sends commands to the source, transform, and sink objects that control the flow of the broadcast data within the system

- The term "**obtains data stream buffers**" means

   **Verizon's Proposal**[11]: obtains buffers containing data streams

---

[6] In a filing dated August 31, 2012, Verizon has asked the Court to clarify that "self-regulated" means "controlling the flow of data in and out of buffers where the buffers are not large enough to accommodate the expected data flow (e.g., by blocking or reducing the flow until sufficient buffer memory is available).

[7] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.

[8] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.

[9] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.

[10] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.

[11] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.

- The term **"temporarily stores video and audio data"** means

  **Verizon's Proposal**[12]: the physical data source places the video and audio data into memory temporarily

- The term **"said source object converts video data into data streams and fills said buffer with said streams"** means

  **Verizon's Proposal**[13]:  said source object converts the video data it has taken from the physical data source into video data streams and fills said buffer with said streams

- The term **"wherein said transform object stores and retrieves data streams onto a storage device"** means

  **Verizon's Proposal**[14]:  the transform object reads and writes data streams to and from a nontemporary storage device

- The term "**parses**" means  analyzes

- The term "**parses video and audio data from said broadcast data**" means analyzes video and audio data from the broadcast data

- The term "**obtains a buffer**" means obtains memory where data can be temporarily stored for transfer

**For the '015 Patent**

- The term **"detecting current position in the program material where the termination occurred"** means

  **TiVo's Proposal**: determining the current position in the program material where the termination of the fast forward or the reverse progression occurred

---

[12] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.

[13] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.

[14] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.

**Verizon's Proposal**[15]: determining the point in the audio or video program where the user discontinued fast forward or reverse mode

- The term **"adding a positional offset to the current position when reverse mode has been terminated or subtracting a positional offset from the current position when fast forward mode has been terminated"** means

  **TiVo's Proposal**: adding a value to the current position to compensate for the difference in position when reverse mode has been terminated or subtracting a value from the current position to compensate for the difference in position when fast forward mode has been terminated

  **Verizon's Proposal**[16]: adding data that identifies the position of an individual video segment within the stream where playback mode should begin when reverse mode or fast forward mode has been terminated

- The term **"module"** means "a portion of a device and/or a software program that carries out a specific function and may be used alone or combined with other modules of the same device or program"

- The term **"calculating"** means

  **Verizon's Proposal**[17]: calculating… by adding…or subtracting

- The term **"calculating a new position in the program material"** means

  **Verizon's Proposal**[18]: calculating a new position in the program material…by adding a positional offset to the current position when reverse mode has been terminated or subtracting a positional offset from the current position when fast forward mode has been terminated

- The term **"calculating step"** means

  **Verizon's Proposal**[19]: calculating… by adding…or subtracting

---

[15] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.

[16] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.

[17] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.

[18] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.

[19] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.

- The term **"calculates the new position based on a user-selected speed of the fast forward or reverse progression"** means

  **Verizon's Proposal**[20]: calculating a new position…by adding…or subtracting a positional offset… based on a user-selected speed of the fast forward or reverse progression

- The term **"user's expected termination point"** means

  **TiVo's Proposal**:

  **Verizon's Proposal**[21]: indefinite, unless construed as, the point in the audio or video program where the user's past corrections indicate the user intended to begin playback after discontinuing fast forward or reverse mode

**For the '465 Patent**

- The term **"digital video recorder"** means

  **TiVo's Proposal**: a device capable of recording multimedia programs in digital form

  **Verizon's Proposal**[22]: a device capable of recording digital video

- The term **"video segment"** means

  **TiVo's Proposal**: a portion of video from a multimedia program

  **Verizon's Proposal**[23]: all or part of a multimedia program comprising video

- The term **"to cause delivery of selected video segments to an output subsystem"** means

  **TiVo's Proposal**: to cause delivery of selected video segments to a subsystem in the digital video recorder wherein the subsystem produces output signals

  **Verizon's Proposal**[24]: to cause delivery of selected video segments to a subsystem

---

[20] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.
[21] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.
[22] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.
[23] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.

within the DVR capable of simultaneously producing television signals for the stored program and the program whose storage is in progress

- The term **"allows playback rate and direction of each multimedia program to be controlled individually and simultaneously to perform any of: fast forward, rewind, frame step, pause, and play functions"** means  is capable of changing the playback rate and direction of each multimedia program such that each program can be independently and simultaneously controlled to execute any of the following modes: fast-forward, rewind, frame-step, pause and play.

- The term **"module"** means "a portion of a device and/or a software program that carries out a specific function and may be used alone or combined with other modules of the same device or program"

- The term "**input signal tuner**" means hardware and/or software capable of selecting a specific multimedia program

**For the '344 Patent**

- The term **"attribute rating"** means "a representation of viewer preference for the attribute"

- The term "**receiving ratings from the viewer corresponding to the attributes for said predetermined audiovisual program, before said updating step"** means "obtaining ratings data from the user that can be used to modify the stored attribute ratings in the viewer preference file"

- The term **"soliciting a ranking from the viewer for each of said preferred audiovisual programs in a list"** means "seeking to obtain from the viewer user-assigned positions or places for each audiovisual program in the list, *i.e.*, programs in

---

[24] The Court, in its Markman Order dated March 12, 2012, rejected Verizon's construction.  Verizon has added this construction to preserve all of its rights, including on appeal.

the list are placed on a preference scale relative to one another"

For claim terms that I have not construed or explained further, you are to use the ordinary meaning of the term in the context of the patent.

Adapted from *DataTreasury Corp. v. U.S. Bank, N.A.*, No. 2:06:-CV-72 (DF) (E.D. Tex.); adapted from *Paice LLC v. Toyota Motor Corp.*, No. 2:04-CV-211 (DF) (E.D. Tex.).

## "COMPRISING" CLAIMS

The beginning, or preamble, portion of all of the asserted claims of the patents-in-suit use the word "comprising."  "Comprising" means "including" or "containing but not limited to."  A claim that uses the word "comprising" is not limited to systems or methods having only the elements recited in the claim, but also covers systems or methods that add additional elements.

For example, if a patent claim recites a table "comprising" three elements - a tabletop, legs and glue - the claim will cover any table that contains these structures, even if the table also contains additional elements, such as a leaf or wheels on the legs.

Similarly, in the case of a method claim, the word "comprising" means that the claim is infringed if all the claimed steps are performed, even if additional steps are also performed.

All asserted claims in the '389, '465, '015, and '344 Patents use the "comprising" language.

*TiVo Inc. v. EchoStar Communications Corp.*, No. 2:04-CV (DF) (E.D. Tex.); *DataTreasury Corp. v. U.S. Bank, N.A.*, No. 2:06:-CV-72 (DF) (E.D. Tex.); *Paice LLC v. Toyota Motor Corp.*, No. 2:04-CV-211 (DF) (E.D. Tex.).

## VIII.   INFRINGEMENT

A patent owner has the right to stop others from using the invention covered by its patent claims in the United States during the life of the patent.  If any person makes, uses, sells or offers to sell within the United States or imports into the United States what is covered by the patent claims without the patent owner's permission, that person is said to infringe the patent.

In reaching your decision on infringement, keep in mind that only the claims of a patent can be infringed.  You must compare the asserted patent claims, as I have defined each of them, to the accused products, and determine whether or not there is infringement. You should not compare the accused products with any specific example set out in the patent or with the patent holder's commercial products or with the prior art.  The only correct comparison is with the language of the claim itself, as I have explained its meaning to you.

You must consider each claim individually and must reach your decision as to each assertion of infringement based on my instructions about the meaning and scope of the claims, the legal requirements for infringement, and the evidence presented to you by the parties.

A person may be found to infringe a patent even if he or she believes in good faith that what he or she is doing is not an infringement of any patent, and even if he or she does not even know of the patent.

In this case, TiVo alleges that Verizon infringes claims 31 and 61 of the '389 Patent, claims 1, 4, 8, 10, and  13 of the '465 Patent, and claims 3,  15,  and  19 of the '015 Patent through Verizon's use of the Motorola QIP2708, QIP6416, QIP7216, and QIP7232 DVRs.  It is your responsibility to determine whether or not TiVo has proven by a

preponderance of the evidence that Verizon has infringed any of these asserted claims.

Likewise, Verizon alleges that TiVo infringes claims  2, 3, and 4 of the '344 Patent.  It is

your responsibility to determine whether or not Verizon has proven by a preponderance of

the evidence that TiVo has infringed any of these asserted claims.

> *TiVo Inc. v. EchoStar Communications Corp.*, No. 2:04-CV (DF) (E.D. Tex.);
> *DataTreasury Corp. v. U.S. Bank, N.A.*, No. 2:06:-CV-72 (DF) (E.D. Tex.); *Paice LLC
> v. Toyota Motor Corp.*, No. 2:04-CV-211 (DF) (E.D. Tex.).

## INFRINGEMENT – ADVERSE INFERENCE INSTRUCTION

You are instructed that TiVo destroyed an animation that was presented to the United

States Patent & Trademark Office to show the difference between the claimed "automatic

flow control" and buffer management in claims 31 and 61 of the '389 patent.  This is known

as the "spoliation of evidence."  Given TiVo's conduct, Verizon was unable to use this

animation in this litigation.  In your deliberations, you may infer that the animation TiVo

destroyed contained information that would be harmful to TiVo's infringement contentions in

this litigation.   Thus, in deciding whether Verizon's use of the Motorola DVRs infringe you

should give less weight to TiVo's witnesses and experts.

*Whitt v. Stephens County*, 529 F.3d 278, 284–85 (5th Cir.2008); *Ashton v. Knight*, 772 F.
Supp. 2d 772, 795 (N.D. Tex. 2011); *VocalSpace v. Lorenso*, 2010 WL 5247451 (E.D. Tex.)

## INFRINGEMENT - EVERY CLAIM ELEMENT MUST BE PRESENT

In order to infringe a patent claim, a product must include every limitation of

the claim.  You must consider each of the asserted claims of the patents-in-suit

separately.

A claim limitation may be present in an accused product in one of two ways, either

literally or under what is known as the doctrine of equivalents.  A claim limitation is

literally present if it exists in the accused product just as it is described in the claim

language, either

as I have explained that language to you or, if I did not explain it, according to the ordinary meaning in the context of the patent.

If you find that every limitation of a claim is found in the accused products or their methods of use, then the claim is infringed, even if the accused product or their methods of use may be more or less efficient or may include additional features or functions not found

in the claims. Practicing the prior art is not a defense to patent infringement. A patent claim is infringed if an accused product or its method of use contains each claim limitation. You should not compare the accused products to the specific examples in the specification. Rather the proper comparison is between the accused products and the claim language as construed by the court.

Adapted from *TiVo Inc. v. EchoStar Communications Corp.*, No. 2:04-CV (DF) (E.D. Tex.); *Paice LLC v. Toyota Motor Corp.*, No. 2:04-CV-211 (DF) (E.D. Tex.).

## INFRINGEMENT OF DEPENDENT CLAIMS

My instructions on infringement so far have related to independent claims. However, the '465, '015, and '344 Patents contain dependent claims. A dependent claim includes each of the limitations of the independent claim to which it refers, plus additional limitations set out in the dependent claim itself.

For example, if you find that independent claim 1 of the '465 patent has been infringed, you must separately determine whether dependent claim 4 has also been infringed. However, if you find claim 1 has not been infringed, you must find that dependent claim 4 has not been infringed. The following claims are dependent claims asserted in this case: claims 4, 8, and 13 of the '465 Patent; claims 3, 15, and19 of the '015 Patent; and claims 2, 3, and 4 of the '344

Patent.

Adapted from *TiVo Inc. v. EchoStar Communications Corp.*, No. 2:04-CV (DF) (E.D. Tex.); adapted from *Paice LLC v. Toyota Motor Corp.*, No. 2:04-CV-211 (DF) (E.D. Tex.).

## INDIRECT INFRINGEMENT - GENERALLY

Up to this point, I have instructed you regarding direct infringement.  A patent owner, however, may also enforce a patent against indirect infringers.  There are two types of indirect infringement - inducing infringement and contributory infringement.  The act of encouraging or inducing others to infringe a patent is called "inducing infringement."  The act of contributing to the infringement of others by, for example, supplying them with components used in the patented invention is called "contributory infringement."

In this case, TiVo accuses Verizon of inducing and contributing to the infringement of the asserted claims of the '389, '465, and '015 Patent claims.  TiVo must prove by a preponderance of the evidence that Verizon has induced or contributed to the infringement of any of these claims.  In addition, Verizon accuses TiVo of inducing and contributing to the infringement of the asserted claims of the '344 Patent claims.  Verizon must prove by a preponderance of the evidence that TiVo has induced or contributed to the infringement of any of these claims.

Adapted from *SSL Services, LLC v. Citrix Systems, Inc.*, No. 2:08-CV-158 (JRG) (E.D. Tex.).

## INDUCING PATENT INFRINGEMENT

An alleged infringer is liable for inducing infringement of a claim only if the patent holder proves by a preponderance of the evidence that:

- 24 -

(1)      the acts are actually carried out by the alleged infringer's customers and directly infringe that claims;

(2)      the alleged infringer took action during the time the asserted patents were in force intending to cause the infringing acts by the alleged infringer's customers; and

(3)      the alleged infringer was aware of the asserted patents and knew that the acts, if taken, would constitute infringement of those patents or the alleged infringer believed there was a high probability that the acts, if taken, would constitute infringement of the asserted patents but deliberately avoided confirming that belief.

In order to establish inducement of infringement, it is not sufficient that the alleged infringer's customers themselves directly infringe the claim.  Nor is it sufficient that the alleged infringer was aware of the act(s) by its customers that allegedly constitute the direct infringement.  Rather, you must find that the alleged infringer specifically intended its customers to infringe the asserted patents or that the alleged infringer believed there was a high probability that its customers would infringe the asserted patents but remained willfully blind to the infringing nature of its customers' acts, in order to find inducement of infringement.

*SSL Services, LLC v. Citrix Systems, Inc.*, No. 2:08-CV-158 (JRG) (E.D. Tex.); Federal Circuit Bar Association, *Model Jury Instructions*, § B.3.2 (2012).

## CONTRIBUTORY INFRINGEMENT

TiVo also argues that Verizon is liable for contributory infringement by contributing to Verizon's customers' direct infringement of the '389, '465, and '015 Patents.  In addition, Verizon argues that TiVo is liable for contributory infringement by contributing to TiVo's customers' direct infringement of the '344 Patent.  As with direct infringement and inducement, you must determine contributory infringement on a claim-by-claim basis.

An alleged infringer is liable for contributory infringement of a claim if the patent holder proves by a preponderance of the evidence that:

(1)     the alleged infringer sells, offers to sell, or imports within the United States a component of a product, or apparatus for use in a process, during the time the asserted patent is in force;

(2)     the component or apparatus has no substantial, noninfringing use;

(3)     the component or apparatus constitutes a material part of the invention;

(4)     the alleged infringer is aware of the asserted patent and knows that the products or processes for which the component or apparatus has no other substantial use may be covered by a claim of the asserted patent or may satisfy a claim of the asserted patent under the doctrine of equivalents; and

(5)     that use directly infringes the claim.

In order to prove contributory infringement, the patent holder must prove that each of the above requirements is met.  This proof of each requirement must be by a preponderance of the evidence, *i.e.*, that it is more likely than not that each of the above requirements is met.

*SSL Services, LLC v. Citrix Systems, Inc.*, No. 2:08-CV-158 (JRG) (E.D. Tex.); Federal Circuit Bar Association, *Model Jury Instructions*, § B.3.3 (2012).

## WILLFUL INFRINGEMENT

In this case, TiVo contends that Verizon's alleged infringement of the '389 patent is willful. Verizon contends that TiVo's alleged infringement of the '344 patent was willful.  If you have decided that either Verizon or TiVo has infringed a valid claim of these asserted patents, you must go further and address the additional issue of whether or not this infringement was willful.

The issue of willful infringement relates to the amount of damages the patent holder

is entitled to recover in this lawsuit.  If you decide that any infringement of an asserted

claim was willful, then it is my job to decide whether or not to award increased damages

to the patent holder.  You should not take this factor into account in assessing the

damages, if any, to be awarded.

Willfulness requires you to determine by clear and convincing evidence that the

alleged infringer acted recklessly.  To prove that the alleged infringer acted recklessly,

the patent holder must prove by clear and convincing evidence that the alleged infringer

actually knew or should have known that its actions constituted an unjustifiably high risk

of infringement of a valid and enforceable patent.  Thus, at a minimum you must first

determine that the infringer knew about the patent and knew about the acts that constitute

infringement, otherwise there is no willfulness.   If find that the infringer knew this

information, you then consider the alleged infringer's state of mind.  To determine

whether the alleged infringer had this state of mind, consider all the facts which may

include, but are not limited, to:

(1)      whether or not the alleged infringer acted in accordance with the

standards of commerce for its industry;

(2)      whether or not the alleged infringer intentionally copied a product of

the patent holder that is covered by an asserted patent;

(3)      whether or not there is a reasonable basis to believe that the alleged

infringer did not infringe or had a reasonable defense to infringement;

(4)      whether or not the alleged infringer made a good-faith effort to avoid

infringing the asserted patent(s), for example, whether the alleged infringer

attempted to design around the asserted patent(s); and

- 27 -

(5)       whether or not the alleged infringer tried to cover up its infringement.

None of these factors are determinative, and this list of factors is not an exhaustive list of things you should consider.  Your determination of willfulness should incorporate the totality of the circumstances based on the evidence presented during the trial.

*SSL Services, LLC v. Citrix Systems, Inc.*, No. 2:08-CV-158 (JRG) (E.D. Tex.); Federal Circuit Bar Association, *Model Jury Instructions*, § B.3.8 (2012); *DataTreasury Corp. v. U.S. Bank, N.A.*, No. 2:06:-CV-72 (DF) (E.D. Tex.).

## IX.    VALIDITY - GENERALLY

Verizon contends that the asserted claims in TiVo's '389, '465, and '015 Patents are not valid, and TiVo contends that the asserted claims in Verizon's '344 Patent are not valid. The claims of a patent issued by the United States Patent Office are presumed to be valid; in this case, the validity of the TiVo and Verizon patents is in dispute and it is ultimately your responsibility to determine whether or not each of the asserted patents is valid or invalid.  In order to rebut this presumption, the accused infringer must establish by clear and convincing evidence that the claims in the patent are not valid.  Validity is determined on a claim by claim basis.  If one claim of a patent is invalid, this does not mean any other claim is necessarily invalid.  The validity of each claim must be determined individually.  Claims are construed the same way for purposes of determining infringement as for determining invalidity.

I will now instruct you on the rules you must follow in deciding whether or not any of the claims of the asserted patents has been proven invalid.

 Adapted from *TiVo Inc. v. EchoStar Communications Corp.*, No. 2:04-CV (DF) (E.D. Tex.); *DataTreasury Corp. v. U.S. Bank, N.A.*, No. 2:06:-CV-72 (DF) (E.D. Tex.); *SSL Services, LLC v. Citrix Systems, Inc.*, No. 2:08-CV-158 (JRG) (E.D. Tex.).

### DATE OF INVENTION

These instructions will sometimes refer to the "date of invention."  In this regard, you are instructed that there are two parts to the making of an invention.  First, the inventor has the idea of the invention.  This is referred to as "conception" of the invention.  A conception of an invention is complete when the inventor has formed the idea of how to make and use every aspect of the claimed invention.  When the conception date for a prior art reference is shown to fall somewhere within a range of dates, the earliest conception date that you are permitted to find is the last date in that range.

Second, the invention is "reduced to practice."  Actual making of the invention is

referred to as "actual reduction to practice."  An invention is actually reduced to practice when it is made and shown to work for its intended purpose.  An actual reduction to practice of a claim must include all limitations recited by the claim.  Filing a patent application is a "constructive reduction to practice."  In this case, the application filing date for the '389 Patent is July 30, 1998, the effective application filing date for the '465 Patent is also July 30, 1998 because the '465 Patent is a continuation of the '389 Patent, and the effective filing date for the '015 Patent is March 30, 1999.  These application filing dates are considered the dates of invention unless you find that TiVo has established an earlier date of invention.  In addition, the application filing date for the '344 Patent is September 22, 1993.  This application filing date is considered the date of the invention unless you find that Verizon has established an earlier date of invention.

The inventor's testimony in this regard must be corroborated by additional evidence beyond the testimony of the inventor, such as documentary evidence or testimony of other witnesses.  In deciding the sufficiency of testimony of a corroborating witness, you should consider:

(1)     the relationship between the corroborating witness and the inventor;

(2)     the time period between the alleged conception and trial;

(3)     the interest of the corroborating witness in the subject matter in suit;

(4)     contradiction or impeachment of the witness's testimony;

(5)     the extent and details of the corroborating testimony; and

(6)     the witness's familiarity with the subject matter of the patented invention.

You must evaluate all pertinent evidence, including the inventor's testimony, to determine whether the evidence establishes a particular date of invention.

*DataTreasury Corp. v. U.S. Bank, N.A.*, No. 2:06:-CV-72 (DF) (E.D. Tex.); *Oka v. Youssefyeh*, 849 F.2d 581, 584 (Fed. Cir. 1998).

## ANTICIPATION

In order for someone to be entitled to a patent, the invention must actually be "new." In general, inventions are new when the identical product or process has not been made, used, or disclosed before.  Anticipation must be determined on a claim-by-claim basis.

Verizon and TiVo contend that certain of each other's asserted patent claims are invalid because the claimed inventions are anticipated.  To demonstrate anticipation, the alleged infringer must convince you of this by clear and convincing evidence, *i.e.*, that the evidence highly probably demonstrates that the claim(s) is/are invalid.

Here is a list of ways that an alleged infringer can show that a patent claim was not new:

(1)     An invention is not new if it was known to or used by others in the United States before the date of invention.  An invention is known when the information about it was reasonably accessible to the public on that date.

(2)     An invention is not new if it was already patented or described in a printed publication, anywhere in the world before the date of invention.  A description is a "printed publication" only if it was publicly accessible.

(3)     A patent holder has lost her or his rights if the claimed invention was already patented or described in a printed publication, anywhere in the world by the patent holder or anyone else, more than a year before the effective filing date of the application for the patent.  An invention was patented by another if the other patent describes the same invention claimed by the patent holder to a person having ordinary skill in the technology.

(4)     A patent holder has lost her or his rights if the claimed invention was publicly used, sold, or offered for sale in the United States more than one year before the effective filing date of the application for the patent.  An invention was publicly used when it was

- 31 -

either accessible to the public or commercially exploited.  An invention was sold or offered

for sale when it was offered commercially and what was offered was ready to be patented,

*i.e.*, a description to one having ordinary skill in the field of the technology could have made

and used the claimed invention, even if it was not yet reduced to practice.

(5)     An invention is not new if it was described in a published patent application

filed by another in the United States or under the PCT system and designated the United

States, and was published in English before the date of invention.

(6)     An invention is not new if the claimed invention was described in a patent

granted on an application for patent by another filed in the United States or under the PCT

system and designated the United States, and was published in English and the application

was filed before the filing date of the application for the asserted patent.

(7)     An invention is not new if the invention was made by someone else in the

United States before the invention was made by the patent holder and the other person did

not abandon, suppress, or conceal the invention.  In determining whether the invention was

made by someone else there shall be considered not only the respective dates of conception

and reduction to practice, but also the reasonable diligence of one who was first to conceive

and last to reduce to practice, from a time prior to conception by the other.

Keep in mind that an accused infringer may not establish anticipation by arguing that

the accused product practices the prior art, or by comparing the accused products to a prior

art reference.  Instead, anticipation is established by clear and convincing evidence that each

element of the asserted claim, properly construed, is found in a single prior art reference.

Adapted from Federal Circuit Bar Association, *Model Jury Instructions*, § B.4.3b
(2012); 35 U.S.C. 102(g)(2); *Zenith Elecs. Corp. v. PDI Comm'n Sys.*, 522 F.3d 1348, 1363
(Fed. Cir. 2008).

## OBVIOUSNESS

Verizon and TiVo contend that each other's asserted claims are invalid as obvious. An alleged infringer may prove that a patent claim is invalid by showing, by clear and convincing evidence, that the claimed invention would have been obvious to a person of ordinary skill in the art at the time the invention was made.

The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.  In other words, when a patent claims a structure that is already known in the prior art and that is altered by the mere substitution of one element for another known in the art, the combination must do more than yield a predictable result.  When a patent simply arranges old elements, with each performing the same function it had been known to perform, and yields no more than one of skill in the art would expect from such an arrangement, the combination is probably obvious.

When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different field.  If a person of ordinary skill can implement a predictable variation, the variation may be obvious.

For the same reason, if a technique has been used to improve one system or method, and a person of ordinary skill in the art would recognize that it would improve similar systems or methods in the same way, using the technique is obvious unless its actual application is beyond the level of ordinary skill.  The improvement must generally be more than the predictable use of prior art elements according to their established functions.

In determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls.  What matters is the objective scope of the claim.  If the claim extends to what is obvious, it is invalid.  One of the ways in which a patent's subject matter can be proved obvious is by finding that there

existed at the time of invention a known problem for which there was an obvious solution encompassed by the claim.

For the claim to be invalid because it would have been obvious, you must evaluate the following factors:

(1) the scope and content of the prior art;

(2) the differences, if any, between the patent claims at issue and the prior art;

(3) the level of ordinary skill in the art at the time the inventions-at-issue were made; and

(4) evidence, if any, of certain additional considerations relating to the obviousness or nonobviousness of the inventions at issue.

One additional consideration of obviousness is whether anyone independently invented the claimed invention before or at the same time as the named inventor thought of it.  Additional so-called "secondary" considerations of nonobviousness are:

(1) commercial success of a product due to the merits of the claimed invention;

(2) a long-felt but unsolved need for the solution provided by the claimed invention;

(3) unsuccessful attempts by others to find the solution provided by the claimed invention;

(4) copying of the claimed invention by others;

(5) unexpected and superior results from the claimed invention; and

(6) acceptance by others of the claimed invention as shown by praise from others in the field of the invention or from the licensing of the claimed invention.

For any of these secondary considerations to be probative of nonobviousness, evidence of the consideration must be linked to the claimed inventions.  For example, for commercial success of a product to be probative of nonobviousness, that product must

embody the claimed invention and the merits of the claimed invention must be a likely cause of the commercial success of that product.

You must decide, in view of the evidence presented to you on these factors and considerations, whether or not the inventions-at-issue would have been obvious to a person of ordinary skill in the art at the time the invention was made.  You must make this determination separately for each invention as described in each claim.  In doing so, you must be careful not to determine obviousness using hindsight; many true inventions can seem obvious after the fact.  You cannot look at the invention knowing what persons of ordinary skill in the art know today.  Rather, you must place yourself in the shoes of a person of ordinary skill in the art at the time the invention was made.

In determining what differences there are, if any, between the prior art and the asserted claims of the patents-in-suit, you should not focus solely on the individual differences in isolation.  You must consider the claimed invention as a whole and determine whether it would have been obvious to one having ordinary skill in the art in view of all the prior art at the time each invention was made.

*DataTreasury Corp. v. U.S. Bank, N.A.*, No. 2:06:-CV-72 (DF) (E.D. Tex.).

## PRIOR ART

The following instructions on "anticipation" and "obviousness" refer to the term "prior art."  Prior art may include items that were publicly known or that have been used or offered for sale, publications, or patents that disclose the claimed invention or elements of the claimed invention.  To be prior art, the item or reference must have been made, known, used, published, or patented before the invention was made or more than one year before the filing date of the patent application.  However, prior art does not include a publication that describes the inventor's own work and was published less than one year before the date of invention.

For the claim to be invalid because it is not new, the alleged infringer must show that all of the requirements of that claim were present in a single previous device or method that was known of, used, or described in a single previous printed publication or patent.  We call these things "anticipating prior art."  To anticipate the invention, the prior art does not have to use the same words as the claim, but all of the requirements of the claim must have been disclosed, either stated expressly or implied to a person having ordinary skill in the art in the technology of the invention, so that looking at that one reference, that person could make and use the claimed invention.

*SSL Services, LLC v. Citrix Systems, Inc.*, No. 2:08-CV-158 (JRG) (E.D. Tex.); Federal Circuit Bar Association, *Model Jury Instructions*, § B.4.3a (2012).

## SCOPE AND CONTENT OF THE PRIOR ART

Determining the scope and content of the prior art means that you should determine what is disclosed in the prior art relied on by the alleged infringer.  You must decide whether this prior art was reasonably relevant to the particular problem the inventor faced in making the invention covered by the patent claims.  Such relevant prior art include prior art in the field of the invention, and prior art from other fields that a person of ordinary skill would look to when attempting to solve the problem.

*TiVo Inc. v. EchoStar Communications Corp.*, No. 2:04-CV (DF) (E.D. Tex.); *Paice LLC v. Toyota Motor Corp.*, No. 2:04-CV-211 (DF) (E.D. Tex.).

## DIFFERENCES BETWEEN THE INVENTION OF THE CLAIMS AND THE PRIOR ART

In determining the differences between the inventions covered by the asserted claims of the patents-in-suit and the prior art, you should not look at the individual differences in

isolation.  You must consider the claimed invention as a whole and determine whether or not it would have been obvious in light of all of the prior art.

In deciding whether to combine what is described in various items of prior art, you should keep in mind that there must be some motivation or suggestion for a skilled person to make the combination covered by the patent claims.  You should consider whether or not the prior art "teaches away" from the invention covered by the patent claims.  The question posed is: Would someone reading the prior art be discouraged from following the path taken by the inventor?

*TiVo Inc. v. EchoStar Communications Corp.*, No. 2:04-CV (DF) (E.D. Tex.); *Paice LLC v. Toyota Motor Corp.*, No. 2:04-CV-211 (DF) (E.D. Tex.).

## PERSON OF ORDINARY SKILL

These instructions refer to "one of ordinary skill in the art."  Someone with "ordinary skill in the art" is presumed to know all of the pertinent prior art, not just what the inventor may have known.  Factors to consider in determining the level of ordinary skill in the art include: the educational level and experience of people working in the field; the types of problems faced by workers in the art and the solutions found to those problems; and the sophistication of the technology in the field.

*DataTreasury Corp. v. U.S. Bank, N.A.*, No. 2:06:-CV-72 (DF) (E.D. Tex.).

## WRITTEN DESCRIPTION REQUIREMENT

The patent law contains certain requirements for the part of the patent called the specification.  Verizon contends that TiVo's '465 Patent is invalid because the specification of the patent does not contain an adequate written description of the invention.  To succeed, the alleged infringer must show by clear and convincing evidence that the specification fails to meet the law's requirements for the written description of the invention.

In the patent application process, the applicant must keep the originally filed claims, or change the claims between the time the patent application is first filed and the time a patent is issued.  An applicant may amend the claims or add new claims.  These changes may narrow or broaden the scope of the claims.  The written description requirement ensures that the issued claims correspond to the scope of the written description that was provided in the original application.

In deciding whether the patent satisfies the written description requirement, you must consider the description from the viewpoint of a person having ordinary skill in the field of the technology of the patent when the application was filed.  The written description requirement is satisfied if a person having ordinary skill reading the original patent application would have recognized that it describes the full scope of the claimed invention as it is finally claimed in the issued patent and that the inventor actually possessed that full scope by the filing date of the original application.

The written description requirement may be satisfied by any combination of the words, structures, figures, diagrams, formulas, etc., contained in the patent application.  The full scope of a claim or any particular requirement in a claim need not be expressly disclosed in the original application if a person having ordinary skill in the field of the technology of the patent at the time of filing would have understood that the full scope or missing

requirement is in the written description in the patent application.

*SSL Services, LLC v. Citrix Systems, Inc.*, No. 2:08-CV-158 (JRG) (E.D. Tex.);
Federal Circuit Bar Association, *Model Jury Instructions*, § B.4.2a (2012).

## LACHES

Verizon contends that if it is found to have infringed the '389 patent, TiVo is not entitled to recover damages on the '389 patent because (1) TiVo delayed in filing the lawsuit for an unreasonably long and inexcusable period of time, and (2) Verizon has been or will be prejudiced in a significant way due to TiVo's delay in filing the lawsuit.  Verizon must prove delay and prejudice by preponderance of the evidence.

Whether TiVo's delay in filing its lawsuit was unreasonably long and unjustified is a question that must be answered by considering the facts and circumstances as they existed during the period of delay.  There is no minimum amount of delay required.

If you find that Verizon infringed the '389 patent, and that TiVo's delay in filing this lawsuit was unreasonable and unjustified, you must determine if Verizon suffered material prejudice as a result.  That prejudice to Verizon can be economic or evidentiary.  Whether Verizon suffered evidentiary prejudice can be answered by asking whether Verizon was not able to present a full and fair case against TiVo due to a loss of records, the death or unavailability of witnesses, the impairment of memories about important events because they occurred long in the past, or other similar types of things.  Economic prejudice is determined by whether Verizon changed its economic position in a significant way during the delay resulting in losses beyond merely paying for infringement, such as if Verizon could have switched to a non-infringing DVR if sued earlier, and also whether Verizon's losses likely would have been avoided if TiVo had sued earlier.

## X.   DAMAGES

I will now instruct you as to the determination of damages if you find that a party has met its burden of proving that the other party has infringed the asserted claims and have determined that the patents are not invalid. Even though I am instructing you on how you should determine damages, this should not be taken to mean that I believe that either Verizon or TiVo has infringed or that the patents are valid.  These are issues for you to resolve under the instructions I have given you.  I am instructing you on damages only so that you will have guidance should you decide that TiVo or Verizon is entitled to recover.

If you find that any of Verizon's or TiVo's accused systems or methods have infringed any of the asserted claims of the patents at issue, then you should consider the amount of money that the other party should receive as damages.

Each party claiming infringement has the burden of proving by a preponderance of the evidence the amount of damages caused by alleged infringement.  To carry this burden, that party must sufficiently tie the damages claimed to the facts of the case.  While no party is required to prove its damages with mathematical precision, it must prove them with reasonable certainty.  You should not include damages that are based on speculation that are merely possible, or damages that are based on guesswork.

If you find that there has been an infringement of an asserted claim of a valid patent, the patent owner is entitled to damages adequate to compensate for that infringement.  In this case, TiVo seeks to recover lost profits resulting from  infringement. If TiVo does not prove its claim for lost profits, then TiVo should not be awarded any lost profits damages. In that case, or if TiVo proves its claim for lost profits for only a portion of the infringing sales, then TiVo should be awarded a reasonable royalty for all infringing sales for which it has not been awarded lost profits damages.  Verizon has not asserted a claim for lost profits

and should be awarded a reasonable royalty for all infringing sales.  I will discuss the terms "lost profits" and "reasonable royalty" in more detail shortly.

Damages may only be awarded up through the time of trial and not beyond that time. In determining damages, you must decide how much financial harm the patent owner has suffered by reason of the infringement.

Damages are only to compensate the patent owner, that is, to put the patent owner in the position it would have been in if it patent had not been infringed.  You may not add anything to the amount of damages to punish a party for infringement of a patent or to set an example.

**Authority:**    3/26/2010 *Data Treasury* Instr. (modified); *Uniloc USA, Inc. v. Microsoft Corp.*, --- F.3d ---, 2011 WL 9738 (Fed. Cir. Jan. 4, 2011).

## DAMAGES – WHEN DAMAGES BEGIN

The amount of damages a patent holder can recover is limited to those acts of infringement that occurred after the patent holder gave the infringer notice that it infringed the patents. Notice of infringement can be actual or constructive, and I will explain what those terms mean.

"Actual notice" means that the patent holder communicated to the infringer a specific charge of infringement of the patent by the accused product or device. This notice is effective as of the date given.  The patent holder has the burden of establishing that it is more probable than not that the infringer received notice of infringement on the notice date.

"Constructive notice" means that the patent holder complied with the marking requirement of the patent law.  "Marking" means that substantially all of the products made, offered for sale, or sold under the patent are marked to display the word "patent" or the abbreviation "pat.", together with the number of the patent.   The patent holder has the burden of establishing substantial compliance with the  marking  requirement.  To do  so, the

- 41 -

patent holder must show it is more probable than not that substantially all of the products it made, offered for sale, or sold under the patent were marked, and that it made reasonable efforts to ensure that its licensees who made, offered for sale, or sold products under the patent marked substantially all of their products.

If you find that any valid patent was infringed, your job is to calculate damages from the date the infringer received either actual or constructive notice, whichever was first. You should not award damages for any infringement occurring before the infringer first received notice of the patent.

**Authority:** The National Jury Instruction Project, Model Patent Jury Instructions § 6.3 (June 17, 2009).

## LOST PROFITS

In this case, TiVo seeks to recover lost profits resulting from Verizon's alleged infringement. Lost profits do not result automatically from infringing sales, but rather, must be proved by TiVo by a preponderance of the evidence. One way TiVo may establish lost profits is by proving it is more probable than not that:

1.   there was demand for the patented product or method;

2.   there were no acceptable noninfringing alternatives;

3.   TiVo had the manufacturing and marketing capacity to make any infringing sales actually made by Verizon; and

4.   the amount of profit TiVo would have made if Verizon had not infringed.

Demand for the patented product or method can be proven by significant sales of TiVo's patented product. Demand for the patented product or method can also be proven by significant sales of Verizon's product containing the patented features. However, if you find that Verizon generated new or different markets by sales or marketing efforts because of features other than those claimed by TiVo to infringe its patents, the sales of Verizon's

product cannot establish a demand for the patented product.

In order to be an acceptable substitute, the product must have one or more of the advantages of the patented invention that were important to customers.  An acceptable non-infringing substitute is a product that does not infringe the asserted patents.  A product does not infringe a patent when it either (a) is sold based on a license under that patent or (b) does not include all the features required by the patent.  An acceptable non-infringing substitute is available if, during the damages period, Verizon or a competitor of TiVo's had all the necessary equipment, materials, know-how, and experience to design and manufacture the substitute and sell such substitute instead of Verizon's infringing sales at the time those infringing sales were made.

In order to assess whether there is an absence of acceptable non-infringing alternatives, you must consider whether non-infringing products existed that were acceptable to the specific purchasers of Verizon's DVR products, not "purchasers" generally.   The test is whether purchasers of Verizon's DVR products were motivated to make their purchase because of the features of Verizon's product that were attributable to the claimed and infringed patent claims.

If you determine that any Verizon customers would just as likely have purchased a non-infringing substitute as TiVo's product, then TiVo has not shown it lost any sales relating to those Verizon customers.  Thus, if the realities of the marketplace are that competitors other than TiVo would likely have captured some or all of the sales made by Verizon, then TiVo is not entitled to lost profits on those sales.

TiVo is only entitled to lost profits for sales it could have actually made.  You should consider whether TiVo has proven that it had the manufacturing capacity and the marketing capability to make the sales it claims to have lost.  TiVo must prove that it was more probable than not that it could have made, or could have had someone else make for it, the

additional products it claims that it could have sold but for the infringement. TiVo also must prove that it had the capability to market and sell those additional products.

TiVo may calculate its lost profits on lost sales by computing the lost revenue for its patented product and subtracting from that figure the amount of additional costs or expenses that it would have incurred in making those lost sales, including but not limited to cost of goods, sales costs, packaging, shipping, etc.  Certain fixed costs such as taxes, insurance, rent and administrative overhead may not vary with increases in production or scale. Any costs, which do not vary with increased production or scale, should not be subtracted from the lost revenue when determining damages.   The amount of lost profits cannot be speculative but it need not be proved with unerring certainty.

It is not necessary for TiVo to prove that TiVo and Verizon were the only two suppliers in the market for TiVo to demonstrate entitlement to lost profits.  If the realities of the marketplace are such that "acceptable non-infringing substitutes" were available from suppliers who would have made only some, but not all, of the sales that were made by Verizon, then TiVo may be entitled to lost profits on a portion of the infringing sales.  The burden is on TiVo, however, to show to a reasonable probability of the portion of infringing sales it would have made if Verizon's product was not available.  By the same token, even if you find that TiVo and Verizon were the only two suppliers of products having the advantages of the patented product, it does not necessarily mean that TiVo would have made all Verizon's sales.  The burden is on TiVo to show that its product competed in the same market with Verizon's product and that it would have made those sales if the infringement had not occurred.

**Authority:** AIPLA Model Patent Jury Instructions §§ 12.5, 12.6, 12.7, 12.8, 12.9 (modified).

## REASONABLE ROYALTY

For those infringing sales where TiVo does not seek, or does not prove, lost profits damages, the law requires that you award TiVo a reasonable royalty.  Verizon is to be awarded a reasonable royalty for any sales infringing its asserted patent.  I will now instruct you on how to calculate reasonable royalty damages.

A reasonable royalty is the amount of money a willing patent owner and a willing prospective licensee would have agreed upon at the time of the first infringement for a license to make, use, sell, or offer to sell the claimed invention.  This may be referred to as a hypothetical negotiation.

In considering the hypothetical negotiation, you should focus on what the expectations of the patent-holder and the infringer would have been had they entered into an agreement at the time of first infringement and had they acted reasonably in their negotiations.   You must also assume that both parties believe the patent was valid and infringed.

In addition, you must assume that the patent-holder and infringer were willing to enter into an agreement, and were reasonably and voluntarily trying to reach agreement. Your role is to determine what that agreement would have been.  The measure of damages is what royalty would have resulted from that hypothetical negotiation.

The amount to be determined is the amount which a prudent licensee would have been willing to pay as a royalty and yet be able to make a reasonable profit.  The infringer's actual profits or cost savings may or may not bear on the reasonableness of an award based on a reasonable royalty.

In determining a reasonable royalty, you should consider all the facts at the time of the hypothetical negotiation.  Some of the kinds of factors that you may consider in making your determination are:

(1)     whether the patent-holder had an established royalty for the invention, or in the absence of such a licensing history, whether there were any royalty arrangements that were generally used and recognized in the particular industry at that time;

(2)     the nature of the commercial relationship between the licensor and licensee, such as whether they were competitors or whether their relationship was that of an inventor and a promoter;

(3)     the established profitability of the patented product, its commercial success, and its popularity at the time;

(4)     whether the licensor had an established policy of granting licenses or retaining the patented invention as its exclusive right or had a policy of granting licenses under special conditions designed to preserve its monopoly;

(5)     the commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter;

(6)     the duration of the patent and of any license, as well as the terms and scope of the license, such as whether it is exclusive or non-exclusive or subject to territorial restrictions;

(7)     the rates paid by the licensee  for the use of other patents comparable to the asserted patents;

(8)     whether the licensee's sales of the patented invention would promote sales of its other products and whether the invention would generate sales to the licensor  of non-patented items;

(9)     the utility and advantages of the patented property over the old

modes or devices, if any, that had been used for working out similar results;

(10)   the nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention;

(11)   the extent to which the infringer has made use of the invention and any evidence probative of the value of such use;

(12)   the portion of profits in the particular business that is customarily attributable to the use of the invention or analogous inventions;

(13)   the portion of the profits that should be credited to the invention as distinguished from the non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;

(14)   the opinion and testimony of qualified experts; and

(15)   any other facts which, in your mind, would have increased or decreased the royalty the infringer would have been willing to pay and the patent owner would have been willing to accept acting as normally prudent business people.

One of the factors you may consider in determining the reasonable royalty are the royalties obtained on relevant licenses.  There must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in this case.  Thus, before you consider the royalty rate of any particular license agreement, you must first determine whether that patent license is relevant to the technology at issue in this case.  That

is, before you take a license agreement into consideration, you must first determine that the license agreement relates to technology that is comparable to the technology of the patents-in-suit.   In considering license agreements that the parties  have entered into, you can consider the circumstance of each license in determining what weight to give such a license  in determining the amount of a reasonable royalty.  For example, you may consider whether a particular license agreement included other patents or other property in addition to the patents-in- suit.   You may also consider whether the license was entered into while litigation was pending against the entity that purchased the license. You may consider the posture and circumstances of such litigation, and you may consider that a desire to avoid the expense and inconvenience of litigation may influence a party's decision to enter a license, as well as the amount paid for the license.

In determining the amount of damages, you must consider when the damages began to accrue. The calculation of damages for infringement should begin as of the date the infringement began, although, as I have previously instructed, a party may only be entitled to recover damages from the date the infringer had actual or constructive notice of the patent.

**Authority:** 3/26/2010 *Data Treasury* Instr. (modified); *Georgia Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).

## XI.    CLOSING INSTRUCTIONS

These instructions are given to you as a whole, and you are not to single out one instruction alone as stating the law, but must consider the instructions as a whole.  You have heard all of the evidence in the case and you have heard the argument of counsel.  The Court has given you the charge in this case.  After closing arguments you will retire to the jury room, select one of your members to act as a foreperson, and begin performing the function for which you have been chosen and for which you have been empaneled, in accordance with the oath you took as jurors.

You will remember that at the beginning of the trial, the Court admonished you not to discuss the case with each other until it was submitted to you.  Now is the time for you to begin your discussion, and you certainly may express an opinion from the evidence that you have heard and use any reasonable means to persuade other members of the jury to your convictions and to your honest opinion.  You are to reach a verdict which speaks the truth, and which does justice to all parties without favor, bias or prejudice in any particular, either for or against any party to this lawsuit.  In the course of your deliberations, do not hesitate to reexamine your own views, and change your opinion if convinced it is erroneous.  But, do not surrender your honest conviction as to the weight or effect of the evidence, solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

The verdict must represent the considered judgment of each juror.  In order to return a verdict, it is necessary that each juror agree thereto.  Your verdict must be unanimous.  As soon as you have reached a verdict, you will let this fact be known to the officer who will be waiting upon you and he will report to the Court.

Your verdict will be in the form of Interrogatories for you to answer.  You will take these Interrogatories to the jury room, and when you have reached a unanimous agreement

- 49 -

as to your verdict, you will have your foreperson fill in, date and sign the form and then advise the Security Officer that you have reached a verdict.  During your deliberations you may have any of the exhibits which have been offered into evidence, and the Court will send them to you upon written request.  If you desire further instructions, your foreperson may make this known in writing, and the Court will try to comply with your wishes.

After closing arguments, I will hand the Interrogatories to the Security Officer, and you will follow him to the jury room, select one of your members as foreperson, and begin your deliberations.

*TiVo Inc. v. EchoStar Communications Corp.*, No. 2:04-CV (DF) (E.D. Tex.); *DataTreasury Corp. v. U.S. Bank, N.A.*, No. 2:06:-CV-72 (DF) (E.D. Tex.).